UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JIMMY R. TABER, | ) |
|         **Plaintiff,** | ) ) ) |
| v. | )   Case No. 12-CV-0666-CVE-TLW |
| THE CITY OF SAND SPRINGS, OKLAHOMA, | ) ) ) ) |
|         **Defendant.** | ) ) |

**OPINION AND ORDER**

Now before the Court is Defendant City of Sand Springs' Motion for Summary Judgment (Dkt. # 36). Plaintiff's complaint alleges that the City of Sand Springs, Oklahoma, ("the City") has violated the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. (ADEA), and the Oklahoma Anti-Discrimination Act, Okla. Stat. tit. 25, § 1101 et seq. (OADA). Plaintiff alleges that on two occasions, in November 2010 and July 2011, the City discriminated against him on the basis of his age when it failed to promote him to the street superintendent position within the City's street department. The City argues that plaintiff has failed to establish a prima facie case of age discrimination under the ADEA, that the City had a legitimate, nondiscriminatory reason for not promoting plaintiff, that the City's articulated reason was not pretextual, and that plaintiff's OADA claim fails for the same reasons that plaintiff's ADEA claim fails. Plaintiff responds that he was qualified for the position for which he applied and that he was the subject of unlawful discrimination.

**I.**

Plaintiff began his employment with the City in April 1985 as an assistant animal warden. Dkt. # 37, at 6; Dkt. # 38-2, at 2; Dkt. # 37-8, at 5. Plaintiff requested and received a transfer to the City's street department in 2006. Dkt. # 37, at 6; Dkt. # 38-2, at 2. Initially, plaintiff worked as a laborer for the street department. Dkt. # 37, at 6; Dkt. # 38-2, at 2. The transfer resulted in a pay cut. Dkt. # 37, at 6; Dkt. # 38-2, at 2.

In October 2010, the City posted a vacancy for the position of street superintendent, a vacancy for which plaintiff applied. Dkt. # 38-10. But see Dkt. # 37, at 6 (stating the vacancy was posted in November 2010); Dkt. # 38-2, at 2 (admitting the vacancy was posted in November 2010). Prior to the posting, John Ratliff, the foreman of the street department, informed plaintiff that there would soon be a job opening and encouraged plaintiff to apply for the position. Dkt. # 38-8, at 3; Dkt. # 38-2, at 3; Dkt. # 40, at 4. John Litterell, superintendent of the street department, wrote plaintiff a letter of recommendation. Dkt. # 38-2, at 3; Dkt. # 40, at 4.

The job requirements for the position of street superintendent included possession of a valid Class A Oklahoma operator license. Dkt. # 38-9, at 3; Dkt. # 38-10, at 3; Dkt. # 37-4, at 14; Dkt. # 37-2, at 5. The position also required an Oklahoma non-commercial pesticide/herbicide applications permit. Dkt. # 37-4, at 14; Dkt. # 38-14, at 3; Dkt. # 37-2, at 5. Additionally, an applicant was required to have a high school diploma or general education degree. Dkt. # 37-4, at 14; Dkt. # 37-2, at 5.

Plaintiff had a high school diploma. Dkt. # 38-2, at 4; Dkt. # 40, at 4. Plaintiff obtained a Class A commercial operator's license on December 13, 2010. Dkt. # 38-2, at 4; Dkt. # 40, at 4. Plaintiff "worked under John Ratliff's license for non-commercial pesticide/herbicide application."

Dkt. # 38-2, at 4; see also Dkt. # 40, at 4 (listing no objection to this fact); Dkt. # 38-14, at 3. Plaintiff never obtained his own Oklahoma non-commercial pesticide/herbicide applications permit. Dkt. # 38-10, at 3. Plaintiff had experience with street and highway maintenance. Dkt. # 38-2, at 4; Dkt. # 40, at 5. Plaintiff "had supervisory experience for four and a half years as the president of the Oklahoma Animal Control Association." Dkt. # 38-2, at 4; Dkt. # 40, at 5. He was also a member of its board of directors for six years. Dkt. # 38-2, at 4; Dkt. # 40, at 5. Plaintiff had completed "a forty hour course on leadership for management" and had performed "on the job supervisory duties." Dkt. # 38-2, at 4; Dkt. # 40, at 5. However, plaintiff never performed or acted as a supervisor with the City. Dkt. # 38-14, at 3.

The City performs an initial screening of all applications for a vacancy. Dkt. # 37-7, at 4. Each application is reviewed and scored based on an established set of criteria. Id. The screener is either the department head or an appointee of the department head. Dkt. # 37-3, at 5. After the screening, a number of the candidates would receive interviews. Id.

After the interview, the interviewers would score the interview. Dkt. # 37-3, at 10. Interview scoring was based upon ten different criteria, such as how the interviewee presented himself, skills and abilities, and whether the interviewee was properly dressed. Id. Personnel from human resources lead the interviews and guide supervisors on how to score. Dkt. # 38-2, at 5; Dkt. # 40, at 5-6. An interviewee's final score would be the average of the scores given to him by each interviewer. Dkt. # 37-4, at 8. It is possible to "skew the scores" of an applicant's interview to ensure that a favored candidate is hired. Dkt. # 38-2; at 5; Dkt. # 40, at 6.

The candidate with the highest scoring interview was typically recommended for the position. Dkt. # 37-6, at 3; see also Dkt. # 37-4, at 8.[1] If the top scoring candidate failed to accept the position, the next highest scoring candidate was typically offered the position. Dkt. # 37-4, at 8. If there was a tie or the scores among the top candidate were close, the interviewing panel would discuss which candidate to recommend. Dkt. # 37-6, at 3. In all cases, the hiring supervisor ultimately made the decision as to the recommendation. Dkt. # 38-3, at 3. For street department openings, the recommendation would then be given to Derek Campbell, the City public works director, for his approval. Dkt. # 37-4, at 9. However, the City manager had the final approval on any hire. Dkt. # 37-19, at 3.

Carla Hayes, the direct supervisor for the street superintendent position, performed the screening of the initial applicants for the 2010 street superintendent vacancy. Dkt. # 37-4, at 10; see also Dkt. # 37, at 7; Dkt. # 38-2, at 2. Fifteen candidates were screened.[2] Id. Keden Shrum had the highest initial score, followed by plaintiff and Eric Miller. Id. Ultimately, six candidates were interviewed for the position.[3] Dkt. # 38-19, at 3.

---

[1] The City argues that the highest scoring candidate for a position was always recommended for the job. Dkt. # 40, at 2. The depositions of Kim Booth and Carolyn Decker both make clear that the person with the highest score is typically recommended; this Court has been unable to find evidence that the person with the highest score was always recommended.

[2] One applicant is listed on the screening document, but was not scored. Dkt. # 37-4, at 10. However, the applicant was later interviewed, so it may be inferred that he was screened and scored. See Dkt. # 38-19, at 3.

[3] While Carolyn Decker states that seven applicants were scheduled for interviews, it is clear that she is misreading the interview schedule; Daniel Deo appears on the schedule twice, as his November 17, 2010 interview was rescheduled to November 23, 2010. Compare Dkt. # 37-4, at 4, with id. at 11.

Hayes and a representative of the human resources department participated in all of the interviews for the position. Dkt. # 37, at 7; Dkt. # 38-2, at 2. Hayes performed her own interview evaluations and "gave the scores that she felt were applicable to the applicant." Dkt. # 38-16, at 5; see also Dkt. # 38-2, at 4-5; Dkt. # 40, at 5-6. For all of the interviews except for the interview of Shrum, the human resources department representative was Kim Booth. Dkt. # 37, at 7; Dkt. # 38-2, at 2. For the interview of Shrum, the representative was Carolyn Decker. Dkt. # 37, at 7; Dkt. # 38-2, at 2. Campbell did not participate in either the interview process or the application review. Dkt. # 37, at 7; Dkt. # 38-2, at 2. For the 2010 street superintendent vacancy, Miller received the highest interview score, a 77.5. Dkt. # 37-4, at 8; Dkt. # 38-19, at 3. Shrum had the second highest score, a 77, while plaintiff had the third highest score, a 66.5. Dkt. # 37-4, at 8; Dkt. # 38-19, at 3. Miller declined the position.[4] Dkt. # 37-4, at 8. Hayes ultimately recommended Shrum. Dkt. # 38-3, at 4.[5]

Plaintiff's personnel file shows that plaintiff was promoted to driver on December 25, 2010. Dkt. # 37-8, at 3; Dkt # 37-8, at 7. But see Dkt. # 37, at 8 (stating mistakenly that the promotion occurred December 25, 2011); Dkt. # 38-2, at 3 (admitting mistakenly that the promotion occurred December 25, 2011). The promotion resulted in a pay increase. Dkt. # 37, at 8; Dkt. # 38-2, at 3.

---

[4] Plaintiff argues that the fact that Miller applied for the superintendent job again in 2011 demonstrates that he did not withdraw his application. Dkt. # 38-2, at 2. Plaintiff also offers the fact that Booth and Hayes had a discussion about Miller being a good fit in his current position. Id.; Dkt. # 38-4, at 3. Neither that discussion nor Miller's subsequent application are sufficient to create a genuine dispute as to the fact that Miller withdrew his candidacy; both are entirely consistent with a withdrawal by Miller.

[5] Hayes knew Shrum, advised him to apply for the position, and knew she would interview him. Dkt. # 38-2; at 5; Dkt. # 40, at 6.

5

The position of driver required a Class A commercial driver's license. Dkt. # 38-10, at 3. In January 2011, Shrum was hired as street superintendent. Dkt. # 38-5; at 3.

Shrum was under the age of forty and plaintiff was fifty-seven years of age at the time Shrum was hired as street superintendent. Dkt. # 37, at 7; Dkt. # 38-2, at 3. Shrum listed on his application that he possessed an Oklahoma Class A commercial driver's license. Dkt. # 38-12, at 3. Shrum had not listed on his application that he had an Oklahoma non-commercial pesticide/herbicide permit. Dkt. # 38-2, at 4; Dkt. # 40, at 5.

In January 2011, plaintiff was informed by Hayes that Shrum would be hired as street superintendent. Dkt. # 38-5, at 3-4. Plaintiff began questioning Hayes about Shrum and asked "how old a guy is he?" Id. at 4. Upon learning that Hayes believed Shrum to be thirty-one, plaintiff stated "you know, he's awful young." Id. Plaintiff alleges that Hayes told plaintiff that "Derek [Campbell] decided they wanted to hire someone younger that could grow with the city." Id.; see also Dkt. # 37, at 7; Dkt. # 38-2, at 2. Hayes denies stating that "'Derek wanted to go with a younger guy.'" Dkt. # 37-14, at 9. John Stills was present at the time this discussion allegedly occurred. Dkt. # 38-2, at 2; Dkt. # 40, at 3. Stills corroborates plaintiff's allegation that Hayes told plaintiff that "he did not get the Superintendent's job because Derek [Campbell] wanted to go with someone younger that could grow with the company [sic]." Dkt. # 38-5, at 6.[6] Stills was not interviewed by the City about the incident until September 3, 2011. Dkt. # 38-2, at 2; Dkt. # 40, at 3.

However, it is undisputed that "Campbell never said that the City should hire 'a younger guy who could grow with the City.'" Dkt. # 37, at 9; Dkt. # 38-2, at 3. Additionally plaintiff does not

---

[6]   Whether Hayes made this statement appears to be the only genuine dispute of material fact relevant to this motion. For the purposes of this motion, the Court assumes that Hayes made the statement as alleged.

6

believe that Campbell made a statement to that effect. Dkt. # 37, at 9; Dkt. # 38-2, at 3. Further, "[p]laintiff has testified that he has no evidence of age discrimination other than the statement attributed to Carla Hayes that 'Derek wanted to go with a younger guy who could grow with the City.'" Dkt. # 37, at 10; Dkt. # 38-2, at 3.

On March 29, 2011, plaintiff informed Decker, at the time a human resources administrator, that he planned to file an age discrimination complaint with the EEOC. Dkt. # 37, at 8; Dkt. # 38-2, at 3. He also stated that he did not wish for it to be handled at the City level. Dkt. # 37, at 8; Dkt. # 38-2, at 3. On May 6, 2011, plaintiff "submitted the City's annual discrimination survey, in which he stated that he had been discriminated against because of his age." Dkt. # 37, at 8; Dkt. # 38-2, at 3. Plaintiff was promoted to equipment operator on May 14, 2011. Dkt. # 37, at 8; Dkt. # 38-2, at 3.

In May 2011, Shrum resigned from the position of street superintendent. Dkt. # 37, at 8; Dkt. # 38-2, at 3. The City posted a vacancy for the position on June 2, 2011, and plaintiff applied for the position. Dkt. # 37, at 8; Dkt. # 38-2, at 3. Hayes performed the screening of the initial applicants for the 2011 street superintendent vacancy. Dkt. # 38-6, at 3. Eight applicants were screened. Id. Schorfheide had the highest initial score,[7] followed by Miller. Id. Plaintiff had the

---

[7] Although Schorfheide was not a resident of the City, Hayes incorrectly gave Schorfheide points for being a resident of the City when screening his application. Dkt. # 38-2, at 3; Dkt. # 40, at 3. The bonus for residency was capped at one point. Dkt. # 38-2, at 3; Dkt. # 40, at 3. Hayes compounded her error by giving Schorfheide five points for being a resident, four more points than the screening process allows. Dkt. # 38-2, at 3; Dkt. # 40, at 3. Without the five point bonus, Schorfheide would have had an initial score below Miller's. See Dkt. # 38-6; at 3. However, Schorfheide's score would still have exceeded plaintiff's. See id. Because Schorfheide's score during the initial screening would still have been the second highest score and four candidates were interviewed, this error did not affect the interview process.

7

third highest initial score. Id. Ultimately, four applicants were interviewed by Hayes and Booth. Dkt. # 37, at 8; Dkt. # 38-2, at 3.

For the 2011 street superintendent vacancy, Schorfheide received the highest interview score, a 79. Dkt. # 38-15, at 4. Miller had the second highest score, a 70.5, while plaintiff had the third highest score, a 64.5.[8] Id. Schorfheide was recommended to Campbell because he had the highest interview score. Dkt. # 37-12, at 5; see also Dkt. # 38-3, at 4. The application was then submitted to the City manager. Dkt. # 37-12, at 5.

Schorfheide's hiring was announced by Hayes during a meeting of street department personnel on July 14, 2011. Dkt. # 37, at 9; Dkt. # 38-2, at 3. Plaintiff objected and filed a grievance, because Schorfheide was a probationary employee and plaintiff believed he was unqualified for the position. Dkt. # 37, at 9; Dkt. # 38-2, at 3. The City conducted an investigation of plaintiff's grievance. Dkt. # 37, at 9; Dkt. # 38-2, at 3.

While investigating plaintiff's grievance, the City asked Hayes about the statement that plaintiff had attributed to her, "that 'Derek wanted to go with a younger guy who could grow the City.'" Dkt. # 37, at 9; Dkt. # 38-2, at 3. Hayes "responded in writing that she did 'not recall this particular statement. At the time, his age was unknown to me.'" Dkt. # 37, at 9; Dkt. # 38-2, at 3. Because of her lack of clarity and because she did not specifically deny the comment attributed to her, Hayes was given a written reprimand. Dkt. # 37, at 9; Dkt. # 38-2, at 3. Hayes responded to

---

[8]   Hayes gave plaintiff an interview score of sixty-two, ten points lower than his interview score from the 2010 vacancy. Compare Dkt. # 38-15, at 3, with id. at 4. See also Dkt. # 38-2, at 4; Dkt. # 40, at 5. However, the average interview score given by Hayes in the 2011 interviews was over ten points lower than the average interview score given by Hayes in the 2010 interviews. Compare Dkt. # 38-15, at 3, with id. at 4. At her deposition, Hayes was unable to provide an explanation for the change in plaintiff's scores. Dkt. # 38-15, at 5; Dkt. # 38-2, at 4; Dkt. # 40, at 5.

8

her written reprimand, stating that "she had not said that, 'Derek wanted to go with a younger guy.'" Dkt. # 37, at 9; Dkt. # 38-2, at 3. Upon completion of its investigation, the City determined that age was not a factor in the hiring of Schorfheide. Dkt. # 37, at 9; Dkt. # 38-2, at 3. However, the City had yet to interview Stills about the incident. Dkt. # 38-2, at 3; Dkt. # 40, at 3.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court

9

is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

## III.

**A.     ADEA**

The ADEA makes it unlawful for an employer to refuse to hire [or promote] or discriminate against an individual because of his age. 29 U.S.C. § 623(a)(1). It is the plaintiff's burden to prove that he was discriminated against because of his age. Jones v. Okla. City Pub. Sch., 617 F.3d 1273, 1277 (10th Cir. 2010). "Where, as here, an employee's sex or age discrimination claim relies exclusively on circumstantial, rather than direct, evidence, we apply the burden-shifting scheme of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." Timmerman v. U.S. Bank, N.A., 483 F.3d 1106, 1113 (10th Cir. 2007).[9] The three-step analysis of this scheme applies to claims under the ADEA. Jones, 617 F.3d, at 1278. Plaintiff has presented

---

[9]     The burden-shifting scheme is bypassed if the plaintiff offers direct evidence of discrimination. Tabor v. Hilti, Inc., 703 F.3d 1206, 1216 (10th Cir. 2013).

no direct evidence of age discrimination; plaintiff's evidence of age discrimination is merely circumstantial.[10] Therefore, the three-step McDonnell Douglas framework must be applied.

"That scheme first allocates the burden of production to the employee to establish a prima facie case of discrimination." Timmerman, 483 F.3d at 1113. "If the employee is successful in doing so, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." Id. If the employer articulates such a reason, then the employee "has the full burden to show that the employer discriminated on the basis of [age]" and may do so by showing that the proffered reason is merely a pretext for illegal discrimination. Id.

---

[10]     Although plaintiff's allegation that Hayes told him that "Derek [Campbell] decided they wanted to hire someone younger that could grow with the city" (Dkt. # 38-5, at 3-4) would appear at first blush to be direct evidence, it is actually circumstantial. "Direct evidence demonstrates on its face that the employment decision was reached for discriminatory reasons," while "[c]ircumstantial evidence allows the jury to draw a reasonable inference that discrimination occurred." Danville v. Reg'l Lab Corp., 292 F.3d 1246, 1249 (10th Cir. 2002). If a statement requires an inference to prove a discriminatory motivation, it is circumstantial. Shorter v. ICG Holdings, Inc., 188 F.3d 1204, 1207 (10th Cir.1999), overruled on other grounds by Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003). Hayes's statement appears to show, without the need for inference, that plaintiff was not hired because Campbell wanted to hire someone younger. However, it is undisputed that Campbell never told Hayes that the City wanted to hire someone younger. Dkt. # 37-16, at 3; Dkt. # 37, at 9; Dkt. # 38-2, at 3. Because of this, the evidence shows a discriminatory motive only if an inference is made; i.e., it must be inferred from Hayes's alleged, but undisputedly untrue, statement that Hayes herself refused to promote plaintiff because of his age. In other words, Hayes's statement could act as direct evidence that plaintiff was discriminated against because of Campbell's animus (which is undisputedly not what occurred), but is only circumstantial evidence that plaintiff was discriminated against because of Hayes's animus. It must be inferred from the fact that Hayes attempted to deceive plaintiff with an untrue statement that her superior harbored a discriminatory animus that Hayes, in fact, harbored a discriminatory animus which lead to her passing over plaintiff for the promotion.

11

A prima facie case for failure to promote requires that plaintiff demonstrate by a preponderance of evidence that (1) he is a member of a protected class, (2) he applied for an available position and was qualified for that position, and (3) that he "was rejected under circumstances which give rise to an inference of unlawful discrimination." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981); see also Tabor v. Hilti, Inc., 703 F.3d 1206, 1216 (10th Cir. 2013).

The City admits that plaintiff is a member of a protected class. Dkt. # 37, at 13. However, the City contends that plaintiff was not qualified for the promotion because he was not qualified for the position. Id. "[A] plaintiff who cannot meet objective hiring or promotion criteria cannot establish a prima facie case of discrimination, and the employer is entitled to judgment as a matter of law." Cortez v. Wal-Mart Stores, Inc., 460 F.3d 1268, 1274 (10th Cir. 2006). The City states that plaintiff was unqualified because he did not possess an Oklahoma non-commercial pesticide/herbicide applications permit.[11]

Plaintiff argues that his experience with pesticides and herbicides is sufficient to satisfy the requirement that he have a pesticide/herbicide permit. Dkt. # 38-2, at 8. This simply does not meet the job requirement of possessing an Oklahoma non-commercial pesticide/herbicide applications permit. While it may be true that plaintiff's experience is equally relevant to the position of street superintendent as possession of a permit, it is normally not this Court's task to assess what the qualifications of a position ought to be. See York v. Am. Tel. & Tel. Co., 95 F.3d 948, 945 (10th Cir.

---

[11] The City argues that there are additional reasons that plaintiff is unqualified. These arguments need not be addressed.

1996). However, an exception exists in cases where a qualification has not been consistently applied to all applicants for a position. Id.

There is insufficient evidentiary material to determine that this qualification was not applied consistently. It is undisputed that Shrum's application did not list that he possessed a herbicide/pesticide permit. However, it is unclear that the application included a section in which Shrum was expected to declare that he possessed the permit. See Dkt. # 38-12, at 3. Additionally, the interview evaluation filled out by "CCD" (presumably Carolyn Decker)[12] scored Shrum a five in the category of "Licenses & Certificates," a score signaling that the candidate "has minimum licenses or certifications required for job." Dkt. # 37-4, at 12.[13] Despite scoring Shrum significantly lower than Hayes did, Decker gave him a license score evincing that Shrum possessed the required permit. See Dkt. # 37-4, at 11, 12. There is no evidence suggesting that the pesticide/herbicide permit requirement was not applied to Schorfheide.

It is plaintiff's burden to establish, as part of his prima facie case, that he is qualified for the position to which he applied and, therefore, it is plaintiff's burden to establish that the qualification was inconsistently applied. See Timmerman, 483 F.3d at 1113 (placing the burden of establish a prima facie case on the plaintiff). Because there is insufficient evidence to determine that the pesticide/herbicide qualification was inconsistently applied, this Court will not assess the appropriateness of the qualification. Plaintiff was not qualified for the position for which he applied.

---

[12] Nothing in the evidence suggests that Decker was biased against older candidates or plaintiff in particular.

[13] The pesticide/herbicide permit was considered to be a license or certificate. See Dkt. # 37-4, at 14.

13

Plaintiff is therefore unable to establish a prima facie case of discrimination under the ADEA, and defendant's motion for summary judgment should be granted as to this claim.[14]

**B.   OADA**

Plaintiff's claim under the OADA should also be dismissed. When a plaintiff fails to establish a prima facie claim under the ADEA, he fails to establish a claim of age discrimination under the OADA. LeFlore v. Flint Indus., Inc., No. 98-5024, 1999 WL 89281, at *3 n.4 (10th Cir. Feb. 23, 1999) (affirming district court's holding - unchallenged on appeal - that the legal analysis for plaintiff's OADA claim was the same as his ADEA claim);[15] see also Okla. Stat. tit. 25, § 1350(F) ( "The defending party may allege any defense that is available under . . . the Age Discrimination in Employment Act . . . ." ); Ruleford v. Tulsa World Publ'g Co., 266 Fed. App'x 778, 784 (10th Cir. 2008) ("Without evidence of age discrimination, however, neither the OADA nor ADEA claim could survive summary judgment."); Barzellone v. City of Tulsa, No. 99-5088, 2000 WL 339213, at *5 (10th Cir. Mar. 31, 2000) ("Barzellone's claim under the Oklahoma Anti Discrimination statutes fails for the same reasons her ADA and Title VII claims fail.") (footnote omitted); Anthony v. City of Clinton, No. 98-6188, 1999 WL 390927, at *8 (10th Cir. June 15, 1999) ("Accordingly, we conclude Mr. Anthony fails to establish a *prima facie* case of discrimination under the Americans with Disabilities Act. Mr. Anthony's claim under the Oklahoma Anti-Discrimination Act fails for essentially the same reason."); Stanley v. White Swan, Inc., No. CIV-00-1291-F, 2002 WL 32061753, at *11 (W.D. Okla. Sep. 26, 2002) ("Because the protections

---

[14]   Because plaintiff is unable to establish a prima facie case, defendant's other arguments as to why summary judgment is appropriate need not be addressed.

[15]   This and other unpublished opinions are cited for their persuasive value. See 10th Cir. R. 32.1(A).

provided by [the OADA] are co-extensive with the protections provided by federal law under the ADA, plaintiff's claim of handicap discrimination in violation of state law fails for the same reasons her federal claim fails."). Because plaintiff failed to establish a prima facie claim under the ADEA, his OADA claim also fails. Defendant's motion for summary judgment should be granted as to this claim.

**IT IS THEREFORE ORDERED** that Defendant City of Sand Springs' Motion for Summary Judgment (Dkt. # 36) is **granted**. A separate judgment is entered herewith.

**DATED** this 22nd day of January, 2014.

*[signature]*
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE

15